**NOT FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

JUL 21 2026

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| 1210 CACIQUE STREET, LLC, a California limited liability company, | No. 24-7728 |
| Plaintiff - Appellant, | D.C. No. 2:23-cv-08152-PA-RAO |
| v. | MEMORANDUM* |
| CITY OF SANTA BARBARA, a public entity; DOES, 1 through 50, inclusive; CITY COUNCIL OF THE CITY OF SANTA BARBARA, | |
| Defendants - Appellees. | |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted April 20, 2026
Pasadena, California

Before: FRIEDLAND and MILLER, Circuit Judges, and VITALIANO, District Judge.**
Dissent by Judge MILLER.

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\** The Honorable Eric N. Vitaliano, United States District Judge for the Eastern District of New York, sitting by designation.

Plaintiff 1210 Cacique Street, LLC, the owner of the Flamingo Mobilehome Park in Santa Barbara, California, appeals the district court's dismissal with prejudice of its regulatory takings claim against Santa Barbara ("the City"). Cacique challenges the City's reenactment of a vacancy rent control provision, which imposes a rent increase cap of 10% upon the transfer of mobile home ownership to a new tenant.[1]  We have jurisdiction under 28 U.S.C. § 1291 over the appeal from the district court's final judgment.  We review the dismissal de novo, *Benavidez v. County of San Diego*, 993 F.3d 1134, 1141 (9th Cir. 2021), and we affirm.

To survive a motion to dismiss, a complaint must allege sufficient facts to state a claim that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A regulatory takings claim under *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978), requires showing that the government has imposed a burden on private property rights "so onerous that its effect is tantamount to a direct appropriation or ouster."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  Courts assess that burden through consideration of three factors: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed

---

[1] As is typical for mobile home parks, Plaintiff leases spaces to individuals who own their mobile homes as personal property.

expectations"; and (3) "the character of the governmental action." *Id.* at 538-39

(quoting *Penn Central*, 438 U.S. at 124). Although takings claims are necessarily

fact-specific, that "does not foreclose [their] resolution on a motion to dismiss."

*Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 966 (9th Cir.

2003), *abrogated on other grounds by Lingle*, 544 U.S. at 536.

1.      On the first factor, *Penn Central* requires a comparison of the value

taken from property with the value that remains. *Murr v. Wisconsin*, 582 U.S. 383,

395 (2017). The Complaint alleged that the property suffered a 92.5% reduction in

value. Notwithstanding our observation that we have held in some cases that an

economic impact "ranging from 75% to 92.5% [did] not constitute a taking,"

*Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018), no

case from our court or the Supreme Court establishes a legal floor for economic

impact. We assume without deciding that the complaint has plausibly pleaded a

92.5% diminution in the value of the property as a result of the City's enactment of

the rent control ordinance. We also assume that a 92.5% diminution, if proven,

could support a takings claim and that the first prong of the *Penn Central* test is

satisfied here.

2.      "To form the basis for a taking claim, a purported distinct investment-

backed expectation must be objectively reasonable." *Id.* at 452. Relying on the

Supreme Court's statement that "those who do business in [a] regulated field

cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end," *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) (citation modified), we have held that a mobile home park owner "cannot reasonably expect [their] property to be free of government regulation such as zoning, tax assessments, or, as here, rent control," *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1091 (9th Cir. 2015).

Here, the City's longstanding rent control ordinance expressed the City's interest in "regulat[ing] the rent charged for mobilehome and recreational vehicle spaces used on a permanent basis to prevent severe and inordinate rent increases." Santa Barbara Municipal Code § 26.08.020(D). In light of that expressed intent, one could not reasonably be surprised that the City would buttress the rent control ordinance by later amendment. Cacique purchased the Park twenty-six years after the Supreme Court held in *Yee v. City of Escondido*, 503 U.S. 519 (1992), that limits on rent increases in mobile home parks, even when applied during a period of vacancy between tenants, did not establish a per se taking. *Id.* at 532, 538-39. Although the Supreme Court left open the possibility that such mobile home rent control could constitute a regulatory taking, at the time of Cacique's purchase our court had consistently and uniformly rejected arguments to that effect. *See, e.g., Guggenheim v. City of Goleta*, 638 F.3d 1111, 1124 (9th Cir. 2010) (en banc) (Bea,

J., dissenting) (noting that the challenged ordinance, which the en banc panel majority upheld over a regulatory taking challenge, "provided for a maximum of 10% rent increases upon the sale of the mobile home to a new tenant").

The dissent contends that *Rancho de Calistoga*'s holding does not control here because Cacique alleged that vacancy control is categorically distinct from the rent control already in place at the time of purchase. We disagree. Although it is of course true that not every regulatory change within a heavily regulated field is permissible, the specific regulatory change at issue here was not unforeseeable. Vacancy control is not a novel regulatory concept: the City had previously enacted an identical provision to the one at issue here, repealing it only when intervening legal authority so required, and the City had consistently maintained its broader rent stabilization framework. Vacancy control acts as a supplemental mechanism to further the City's long-standing goals rather than a departure in kind from the regulatory actions it had previously taken.

Cacique argues that the decades-long period in which the City declined to reenact vacancy control, as well as comments by the then-Mayor of Santa Barbara expressing uncertainty as to the legality of vacancy control, support reasonable investment-backed expectations that the City would not implement the challenged provision. Given the regulatory context described above, the period of City inaction that Cacique identifies could not create a reasonable expectation that the

rent control ordinance would remain unchanged. Indeed, every time a city enacts a rent control ordinance for the first time, that action is necessarily preceded by a long period in which no such ordinance existed, but we have rejected the notion that this creates a reasonable expectation of permanent regulatory forbearance. *See Rancho de Calistoga*, 800 F.3d at 1091.

Nor do the statements of the City's former Mayor create a reasonable expectation in permanent deregulation. Even assuming that Mayor Blum's statements reflected a concern that vacancy control could constitute a regulatory taking, they were still just a characterization of the background legal context as he understood it. They were not a promise that the City would refrain from trying to adapt its policies to meet future needs, and indeed conveyed a desire to enact further rent restrictions if courts would allow that. Further, elected officials serve in temporary positions and must stand for regular elections. By design, our democracy contemplates that political views and priorities will change as elected officials do. Cacique cannot establish the objective reasonableness of its investment-backed expectations by reference to one former official's remarks that expressed his understanding of the constraints imposed by a court decision that Cacique could itself have evaluated directly. *See Bridge Aina Leʻa, LLC v. Hawaii Land Use Comm'n*, 950 F.3d 610, 634 (9th Cir. 2020). The regulatory landscape

alleged here, considered as a whole, did not give rise to a reasonable investment-backed expectation that the City would never impose vacancy control.

3. The character of the governmental action prong also weighs against Cacique's takings claim. We have consistently characterized mobile home rent control ordinances as adjustments of the benefits and burdens of economic life to promote the common good rather than as akin to physical invasions of property. *See, e.g.*, *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1128 (9th Cir. 2013) (stating that a mobile home park rent control "[o]rdinance is much more an adjustment of the benefits and burdens of economic life to promote the common good" (citation modified)); *Rancho de Calistoga*, 800 F.3d at 1091 (stating the same and recognizing that we have "consistently given our imprimatur to the underlying public purpose of mobile home rent control ordinances"). In *Colony Cove*, we determined that the central purpose of rent control programs—balancing tenant protection against park owner returns—counsels against a *Penn Central* taking. 888 F.3d at 454. The ordinance at issue here serves a near identical purpose, and Cacique has not pointed to any meaningful distinction between the nature of this action and the nature of other mobile home rent control provisions that our court has upheld.

Cacique's allegations that the ordinance has produced adverse market

7 <span>24-7728</span>

consequences, including inflated mobile home sale prices and increased tenant costs, are accepted as true but do not alter this analysis. Those consequences do not transform a regulatory adjustment into something more closely resembling a physical appropriation. *See Yee*, 503 U.S. at 526-27.

***

Where, as here, the second and third factors weigh decisively against a plaintiff, a complaint does not automatically survive a motion to dismiss on the strength of economic impact alone. *See Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1189 (9th Cir. 2012) (describing how "Supreme Court cases uniformly reject the proposition that diminution in property value, standing alone, can establish a taking" (citation modified)); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (rejecting a taking claim based on the weight of the second factor alone). Given the specific regulatory context presented here, even assuming the first prong is satisfied, the Complaint fails to state a "plausible claim for relief" under *Penn Central*. *Ashcroft*, 556 U.S. at 679.

**AFFIRMED.**



*1210 Cacique Street, LLC v. City of Santa Barbara*, No. 24-7728

MILLER, Circuit Judge, dissenting:

1210 Cacique Street, LLC brings an as-applied challenge to the vacancy-control provision of the City of Santa Barbara's mobile-home park rent-control ordinance. At this stage of the litigation, the question is not whether Cacique will ultimately prevail, but only whether "the complaint's factual allegations, if taken as true, 'state a claim to relief that is plausible on its face.'" *Berk v. Choy*, 146 S. Ct. 546, 553 (2026) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Because Cacique's complaint plausibly alleges a substantial diminution in property value, and no binding precedent forecloses a regulatory-takings claim when such a diminution has been properly pleaded, I would reverse the dismissal and allow the case to proceed to discovery.

The Supreme Court "has recognized few invariable rules" in its Takings Clause jurisprudence and has instead held that "most takings claims turn on situation-specific factual inquiries." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31–32 (2012). In evaluating regulatory-takings claims, we apply the framework of *Penn Central Transportation Co. v. City of New York*, which generally requires considering (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental

1

action." 438 U.S. 104, 124 (1978). These factors are "not a set formula," and our inquiry focuses on the collective sufficiency of the plaintiff's allegations. *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc); *accord Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 326 (2002*)*.

At the motion-to-dismiss stage, Cacique has established that the first factor weighs in its favor. Based on projections of its future lost rental income caused by the ordinance, Cacique alleges that the City's vacancy provision has resulted in a nearly $7 million loss in value—representing a 92.5 percent decrease from the value of the property when Cacique purchased it in 2018. Taking those allegations as true, as we must at this stage, Cacique has pleaded a substantial diminution in value. To be sure, Cacique's complaint could have been more precise about the inputs to its calculation, including by specifying its assumptions as to the tenant turnover rate, as well as the difference between market-rate rent increases upon a change in ownership and the 10 percent cap imposed by the ordinance. Even so, the allegation of a 92.5 percent reduction in value is sufficient for Cacique to have plausibly pleaded the "economic impact" factor under *Penn Central*. *See* 438 U.S. at 124; *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1189 (9th Cir. 2012) (recognizing that the first *Penn Central* factor requires "no precise minimum threshold" of economic loss). In concluding otherwise, the district court effectively

2

required Cacique to prove an element of its case in the complaint. But we do not

demand sophisticated factual development at the motion-to-dismiss stage. *See*

*Berk*, 146 S. Ct. at 553 ("A complaint . . . 'may proceed even if it strikes a savvy

judge that actual proof of the facts alleged is improbable.'" (quoting *Bell Atl.*

*Corp.*, 550 U.S. at 556)).

The court today concludes that even assuming Cacique satisfies the first

*Penn Central* prong, the complaint nevertheless fails to state a plausible claim for

relief because the second and third *Penn Central* factors weigh against Cacique. I

am not sure that this is correct as to the second *Penn Central* factor.

The reasonable investment-based expectations analysis "must consider the

extent to which the challenged regulation departs from or extends beyond past or

conceivable future regulatory developments." *Pakdel v. City & Cnty. of San*

*Francisco*, 636 F. Supp. 3d 1065, 1076 (N.D. Cal. 2022) (citing *Kaiser Aetna v.*

*United States*, 444 U.S. 164, 178 (1979)). Here, Cacique's argument is not

"tantamount to saying that a homeowner can reasonably expect that the tax

assessment or rate of taxation on her home will not increase from the time of

purchase." *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1091 (9th Cir.

2015). Rather, Cacique alleges that the vacancy ordinance was different in kind,

not merely in magnitude, from the rent-control regulation in place when it

purchased the park. At this stage of the litigation, Cacique has plausibly alleged

that it could not reasonably expect that vacancy control would be adopted. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1350 (Fed. Cir. 2003) ("A business that operates in a heavily-regulated industry should reasonably expect certain types of regulatory changes that may affect the value of its investments. But that does not mean that all regulatory changes are reasonably foreseeable or that regulated businesses can have no reasonable investment-backed expectations whatsoever." (emphasis omitted)).

The reasonableness of a plaintiff's expectations must be evaluated against "the regulatory environment at the time of the acquisition of the property." *Bridge Aina Le'a, LLC v. Hawaii Land Use Comm'n*, 950 F.3d 610, 634 (9th Cir. 2020). When Cacique purchased the mobile-home park in 2018, vacancy control was not part of the City's rent-control scheme. The court today concludes that because the City had previously enacted a provision identical to the one at issue here, Cacique should have foreseen the possibility that vacancy control could be enacted again, and thus the City's decades of inaction did not create an expectation that the City's rent-control regime would remain unchanged. But that reasoning stretches our precedent in two different ways. First, the fact that an identical provision was enacted 34 years before (and subsequently repealed due to intervening precedent) is not part of "the regulatory environment *at the time of the acquisition* of the property." *Id.* (emphasis added). Second, we have never adopted a per se rule that

4

whenever a regulatory change was foreseeable, a takings claim will automatically fail the second prong of *Penn Central*. The Supreme Court has made clear that a property owner's notice of a preexisting regulation does not categorically bar a regulatory takings claim. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 626–28 (2001). By the same token, the foreseeability of a post-acquisition regulation should not, by itself, warrant dismissal of a regulatory-takings claim based on that later-enacted regulation.

Cacique's argument on the second prong is bolstered by a 2006 statement by the then-mayor of Santa Barbara noting that a "court threw out the City's rent control ordinance" and that the City's "very bright City attorneys have not been able to get around this ruling" to support the reasonableness of its investment-backed expectations. A jury could reasonably infer from the mayor's statement that the mayor believed the City was barred from imposing the vacancy provision and that the City's attorneys had given up on trying to reenact it. In *Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir. 1986), we had struck down an identical vacancy-control ordinance enacted by the City, and even though that decision was abrogated by the Supreme Court in *Yee v. City of Escondido*, 503 U.S. 519 (1992), the Court's holding was limited: *Yee* held only that a vacancy-control provision in mobile-home rent-control ordinances is not a per se taking, but the decision expressly left open the possibility that it might be a regulatory taking. *Id.* at 537–

5

38. Construing the mayor's statement in the light most favorable to Cacique, it is plausible that the mayor thought that the vacancy ordinance could not be reenacted because of a potential regulatory-takings problem under *Yee*—not because the ordinance was a per se taking under *Hall*. And even if the mayor was wrong about the law, it does not follow that it would be unreasonable for investors to rely on an affirmative statement by a public official that the City could not reenact a vacancy control ordinance.

The court discounts the mayor's statement, reasoning that because "elected officials serve in temporary positions" and "political priorities will change as elected officials do," an official's remarks cannot create an objectively reasonable investment-backed expectation. Given that every government is ultimately run by elected officials, that logic would suggest that no governmental action could ever create reasonable investment-baked expectations. Of course, we have never so held.

In any event, even assuming that Cacique has not adequately pleaded the second or third prong of the *Penn Central* test, its allegations on the first prong should still allow it to survive a motion to dismiss. In holding otherwise, the court converts what is supposed to be a "situation-specific factual inquir[y]," *Arkansas Game & Fish Comm'n*, 568 U.S. at 31–32, into a mechanical exercise in box-checking. That approach finds no support in our precedent: Although some of our

6

decisions have rejected regulatory-takings claims after full factual development when the plaintiff demonstrated substantial economic impact but failed to satisfy the remaining *Penn Central* factors, those cases do not establish a categorical rule at the pleading stage. *See, e.g.*, *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013); *William C. Haas & Co. v. City & Cnty. of San Francisco,* 605 F.2d 1117, 1120–21 (9th Cir. 1979). Instead, our case law suggests that dismissal is appropriate only when *none* of the *Penn Central* factors are plausibly alleged. *See Rancho de Calistoga*, 800 F.3d at 1090–91 (affirming dismissal of an as-applied regulatory-takings claim where none of the three *Penn Central* factors favored plaintiff); *accord 74 Pinehurst LLC v. New York*, 59 F.4th 557, 565–68 (2d Cir. 2023) (same). Until today, we have never rejected a regulatory-takings claim at the motion-to-dismiss stage when the plaintiff pleaded a diminution in value as substantial as the 92.5 percent alleged here.

I would reverse the district court's dismissal and remand for further proceedings.